# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LEROY PALMER,                          )
                                       )
                 *Plaintiff*,          )
                                       )        No. 13 C 1698
        v.                             )        Judge Thomas M. Durkin
                                       )
CRAIG P. FRANZ, RN,                    )
                                       )
                 *Defendant*.          )

## MEMORANDUM OPINION AND ORDER

This is a § 1983 action brought by Leroy Palmer alleging negligence and deliberate indifference while an inmate at the Northern Reception and Classification Center ("NRC") located at the Stateville Correctional Center ("Stateville"). The only defendant remaining in the case is Craig P. Franz, a registered nurse formerly employed by Wexford Health Sources ("Wexford").[1] For the reasons that follow, Franz's motion for summary judgment is granted.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light

---

[1] Wexford is a private company that provides health care services to the Illinois Department of Corrections ("IDOC").

most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## BACKGROUND

Palmer was an inmate in the IDOC during the relevant time period. On January 11, 2012, he was transferred from the Shawnee Correctional Center ("Shawnee") to the NRC. The NRC is a facility located at Statesville where an inmate is temporarily housed when he needs to make a court appearance. *See Verser v. Smith*, 2017 WL 528381, at *9 (N.D. Ill. Feb. 9, 2017). An inmate temporarily assigned to the NRC does not have his complete medical records with him; they remain at his home or "parent" institution. Medical staff at the inmate's parent facility prepare a "transfer summary" to travel with the inmate to the NRC, which is supposed to contain information about the inmate's acute and chronic medical conditions, significant medical history, current medications and treatment, and active medical permits. The transfer summary is reviewed by an intake nurse upon the inmate's arrival at the NRC. The intake nurse observes the inmate for obvious signs of illness, asks questions about the inmate's health history, and then makes notations on the bottom portion of the transfer summary. The summary is

then placed in the inmate's medical file at the NRC. Franz worked for Wexford at the Stateville facility from December 2011 through April 2012, and was the nurse who performed Palmer's intake screening when he arrived at the NRC. At the time of Palmer's screening, Franz was new to both performing intake screenings and to the practice of nursing in general, having obtained his nursing degree only months earlier. During the five months he worked at Stateville, he performed intake screenings on only one or two occasions.

Palmer was born with a congenital deformity of the left arm. Essentially, he is missing most of his left hand.[2] Medical staff at Shawnee made note of Palmer's missing hand at the top part of his transfer summary, where on the line marked "*Physical Disabilities/Limitations*" it was written: "L arm not fully developed/low bunk, low gallery/slow eating pass."[3] R. 161-6. Palmer testified he told Franz during

---

[2] Franz disputes that Palmer "is missing his left hand in its entirety," R. 173 at 1, and claims instead that Palmer "does not have all of the fingers on his left hand," R. 161 at 2 (¶ 7). Palmer argues that Franz "understates the severity of [his] birth defect," and that he "was born with no left hand." R. 166 at 2 (¶ 7). Having viewed a picture in the record of Palmer's disability, the Court believes that Palmer's description is more accurate, although the dispute, to the extent there is one, is not relevant to the outcome of Franz's summary judgment motion.

[3] A low bunk permit based on Palmer's left arm disability is the only permit at issue here, and therefore the Court is not concerned with the fact that Shawnee also had issued Palmer a slow eating pass and a low gallery permit. The Court notes, however, that it is unclear from the record why Palmer had a low gallery permit at Shawnee. Gallery refers to the floor or level within the institution on which the inmate's cell is located. An inmate who had a medical limitation affecting his ability to walk up or down stairs would need a low gallery permit. There is evidence in the record showing that Palmer had a preexisting arthritic condition in his knee. After the incident at issue in this case in which Palmer injured his knee, Stateville issued Palmer both a low bunk and a low gallery permit. But since Palmer's knee injury occurred after he was transferred to the NRC, only his arthritis would explain the preexisting Shawnee low gallery permit.

the screening that Shawnee had given him a low bunk permit of indefinite duration, and he needed a low bunk permit for the NRC because of his missing hand. According to Palmer, Franz responded that he would need to see a doctor if he wanted to get a low bunk permit from Stateville. R. 161-2 at 13, 24 (Palmer Dep. 46-47, 90). The entire encounter between Palmer and Franz lasted no more than ten to fifteen minutes, and Franz testified at his deposition (which occurred more than four years later) he had no memory of Palmer. The transfer summary shows Franz made note at the bottom of the form on a line marked "*Deformities: Acute/Chronic*" that Palmer's left arm was "not fully developed," and that, under the heading "*Plan: Disposition*," Franz had marked the box next to "*Sick Call: Routine.*" Although the form also gave the option of choosing "*Emergency Referral*" or *Sick Call: Urgent*," Franz did not check the box next to either of those things. On the line next to the heading "*Current Medications/Treatment*," Franz wrote the words "see above," where Shawnee medical staff had listed Palmer's current medications and indicated that he had a low bunk permit. *See* R. 161-6.

After the intake screening, Palmer was taken to his cell by correctional officers. The bottom bunk in his assigned cell was already occupied. Palmer testified he told a correctional officer about his low bunk permit from Shawnee, but the officer told Palmer there was nothing he could do because Palmer did not have the permit with him. R. 161-2 at 13 (Palmer Dep. 47). A correctional officer (either the same one or a different one who was a "lieutenant") informed Palmer he needed to get a new permit from "medical," even though it was his (Palmer's) understanding

that his "low bunk pass from Shawnee would apply." *Id.* at 16-17 (Palmer Dep. 61-62). Palmer testified he never asked his cell mate to switch bunks with him because he believed it was the correctional officer's job to do so. *Id.* at 12 (Palmer Dep. 45). When asked about the possibility of putting his mattress temporarily on the floor of the cell until a new medical permit was issued to him, Palmer testified "Why would I?" *Id.* at 12-13 (Palmer Dep. 45-46).

In the days following his arrival at the NRC, Palmer claims to have submitted two requests for medical treatment to obtain a low bunk permit to replace the Shawnee one that the correctional officers were not honoring. He placed the requests in the door for a correctional officer to pick up and turn in because "[a]t NRC, you're in the cell 24 hours a day." *Id.* at 23 (Palmer Dep. 87). The record does not contain any additional information regarding what happened to Palmer's sick call requests, although it is undisputed that Palmer was not taken to see a doctor before the date of the incident, which occurred ten days after his arrival at the NRC. On the morning of January 22, 2012, Palmer was attempting to get out of his bunk when he fell trying to lower himself without the aid of a ladder,[4] causing injury to his right knee. IDOC medical records state that Palmer's knee showed no signs of trauma after the fall. Palmer, on the other hand, claims that the fall caused damage to his knee requiring knee replacement surgery, and he has submitted expert medical testimony to support that claim.

---

[4] The "absence of ladders is a common feature of prison bunk beds." *Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688, 691-92 (7th Cir. 2013).

DISCUSSION

## A.   EIGHTH AMENDMENT

Courts have "routinely dismissed" Eighth Amendment claims based on the lack of a ladder to access the top bunk, "finding that this condition does not pose a serious risk of harm." *Richard v. Ill. Dep't of Corr.*, 2016 WL 2941210, at *5 (S.D. Ill. May 20, 2016) (collecting cases); *see also Blue v. Baenen,* 2016 WL 8711729, at *9 (E.D. Wis. May 20, 2016) (same). But the issue here is different because Palmer has only one hand and had a permit from Shawnee indicating that he needed to be assigned a low bunk for medical reasons. Palmer argues that Franz violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to take steps to ensure he was issued a low bunk permit during his stay at the NRC.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (internal citations and footnote omitted). A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. A prisoner first must establish that his medical condition is "objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). If he establishes the objective component, he then must establish that prison officials acted with "a 'sufficiently culpable state of mind," *i.e.,* that they both knew of and

disregarded an excessive risk to inmate health. *Id.* at 834, 837; *see Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Franz argues that neither component is met here.

### 1.  SERIOUS MEDICAL NEED

In the recent case of *Estate of Simpson v. Gorbett*, 863 F.3d 740 (7th Cir. 2017), the Seventh Circuit addressed the objective component of an Eighth Amendment claim in the context of an accident involving an inmate's assignment to a high bunk. The inmate in *Simpson* "was intoxicated when he reported to [a county] jail to serve his weekend stay, prompting officers initially to place him in a holding cell. After they thought he was sober, they assigned him to an upper bunk in a two-person cell, even though he was obviously obese. While sleeping, [the inmate] went into convulsions and fell off the bunk on to the hard concrete floor. He died from his injuries." *Id.* at 742. The inmate's estate brought an Eighth Amendment claim against five officers and the sheriff. In affirming the district court's grant of summary judgment in favor of the defendants, the Seventh Circuit said that the question posed was not whether "top bunks[ ] are unconstitutional for all inmates," but whether "the assignment of a morbidly obese man to this narrow, upper bed" was. *Id.* at 746. Nevertheless, the court said, the "argument that the bunk was unreasonably dangerous to [the obese inmate] rest[ed] almost entirely on hindsight—that is, what happened after [the inmate] had been sleeping in apparent safety for several hours, when he suddenly had convulsions, tumbled off, and suffered his fatal injury." *Id.* Because the inquiry was objective, the court said it could not "base [its] conclusion exclusively on what came to pass," and, given the

record, could not "conclude that [the inmate's] bunk assignment objectively was so dangerous that it denied [the inmate] 'the minimal civilized measure of life's necessities.'" *Id.* (citations omitted).

This case is distinguishable from *Simpson* because of the fact that Palmer already had been issued a Shawnee medical permit requiring a low bunk.[5] *See Greeno*, 414 F.3d at 653 (a medical need is an objectively serious condition if it has "been diagnosed by a physician as mandating treatment"). Moreover, Palmer's physical disability warranting the Shawnee low bunk permit was obvious. The *Simpson* court "assume[d] that there are some circumstances where a small, elevated bed might pose a 'substantial risk of serious harm' to an inmate's health or safety." 863 F.3d at 745-46 (quoting *Farmer*, 511 U.S. at 834). A jury could conclude based on Palmer's missing left hand and the existence of a medical permit that this is one of them. *See, e.g., Bolling v. Carter*, 819 F.3d 1035, 1036 (7th Cir. 2016) (implicitly recognizing that an inmate who had been issued a low bunk permit has a serious medical need).

Franz argues that Palmer's missing hand does not meet the definition of a serious medical condition because Palmer did not need *treatment* for his arm. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (defining a serious medical condition as one "that would result in further significant injury or unnecessary and

---

[5] Franz's response to Palmer's Local Rule 56.1 Statement neither admits nor denies that Palmer had a low bunk permit from Shawnee. Therefore, the Court will deem that fact to be admitted. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012) (if a party fails to respond to a L.R. 56.1 statement of uncontested facts, then those facts are deemed admitted to the extent they are supported by the evidence in the record).

wanton infliction of pain if not *treated*.") (emphasis added). But the Seventh Circuit did not intend to use the word "treated" in the limiting sense suggested by Franz, as the test is sometimes expressed as being a medical condition requiring a "*doctor's attention.*" *Greeno,* 414 F.3d at 653 (emphasis added). Although Palmer's medical condition may not have required treatment per se, it did require accommodation. For Palmer to receive that accommodation, he needed to be examined by a physician or other authorized medical personnel,[6] who then would determine based on medical judgment whether to issue a permit for a low bunk assignment.[7] In short, a reasonable jury could find that an inmate who a doctor has recognized is in need of a medical permit meets the objective test of a serious medical condition. Franz's argument to the contrary is rejected.

## 2. DELIBERATE INDIFFERENCE

Turning to the subjective part of the test, "[a] jail or prison official may be found liable only if he knows of and disregards an excessive risk to inmate health or safety. This means that the defendant[ ] must have acted with more than simple or even gross negligence, although [he] do[es] not need to act purposefully or knowingly inflict harm." *Estate of Simpson*, 863 F.3d at 746 (internal quotation

---

[6] Medical permits typically are issued by physicians, but they also may be issued by physician assistants and nurse practitioners. *See* R. 167-3 at 21-22 (Fisher Dep. 80-81).

[7] *See* R. 167-3 at 82 (testimony by Wexford representative that issuance of a permit requires the exercise of medical judgment); R. 167-5 at 4 (Duffield Dep. 8) (testimony of IDOC representative that a low bunk/low gallery permit is "a special order that's provided by the attending physician or practitioner that grants the privilege of a low bunk/low gallery according to their medical assessment").

marks and citations omitted). The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

Palmer argues that Franz knew a high bunk assignment exposed Palmer to a substantial risk of serious harm because of his missing hand. "An inmate can demonstrate that a prison official knew of a substantial risk of harm if the fact of that risk is obvious." *Calhoun v. Howard*, 2015 WL 5462221, at *4 (N.D. Ill. Sept. 16, 2015); *see Estate of Simpson*, 863 F.3d at 746 ("The requisite level of knowledge may be inferred in instances where the risk posed by the condition is obvious."). Franz admits that Palmer "has an obvious congenital deformity of his left hand." R. 173 at 1. Still, Franz makes a number of arguments for why a reasonable jury could not infer knowledge on his part of a substantial risk of serious injury from a high bunk assignment to someone like Palmer with a missing hand. For instance, Franz argues that Palmer was able to get in and out of the top bunk for ten days without injuring himself and that it would have been reasonable for him to have assumed that, because Palmer has lived with his disability since birth, he is likely to have learned how to overcome his physical limitations.

In *Estate of Simpson*, the Seventh Circuit noted that "[t]he Eighth Amendment demands that officials ensure 'reasonable safety,' not that they protect against all risks. The risk of injury from a fall onto a concrete floor is obvious, [ ] the chance that someone would fall is not." 863 F.3d at 746 (internal citations omitted).

The *Simpson* court held that there was no evidence in that case that the correctional officers were aware of the risk posed by a high bunk assignment to an obese man who obviously had an alcohol problem, or that they knew the risk was excessive, pointing out that there was no evidence showing that other obese inmates or others suffering from alcohol withdrawal had ever fallen out of their bunks at the jail. *Id.* Similarly, here, there is no evidence that other persons with physical disabilities similar to Palmer's had ever fallen while trying to get down from a high bunk without a ladder. And, as the Seventh Circuit noted, "[t]he rule is that an official who should have, but failed, to perceive a significant risk cannot be held liable." *Id.* at 747 (citing *Farmer,* 511 U.S. at 844).

Despite the above, the Court declines to resolve the question of Franz's knowledge on the basis of the current record. The obviousness of the risk here is greater than the obviousness of the risk in *Simpson,* where the inmate's fall from the bunk was due to not just the inmate's obvious obese condition but also to the inmate having suffered from alcohol-induced convulsions during his sleep, something which the defendants may not have been able to foresee. Nevertheless, even assuming that a reasonable jury could conclude from the evidence that Franz knew of the risk of injury to Palmer from a high bunk assignment, that would not be enough. Palmer's deliberate indifference claim against Franz requires proof not only that Franz knew of the serious risk of injury but that he "acted or failed to act in disregard to that risk." *Calhoun*, 2015 WL 5462221, at *4.

Because Franz is a nurse, his actions or failure to act in disregard of the risk to Palmer must relate to the provision of medical treatment for Palmer's missing left hand (as opposed to Palmer's condition of confinement of being assigned to a high bunk, for which Franz has no responsibility). The only medical treatment that could be provided for Palmer's condition was issuance of a low bunk permit. But Franz did not have the authority to issue medical permits. *See* R. 161-4 at 15 (Garcia Dep. 57) (medical permits can be issued only by medical personnel who are licensed to diagnosis, and nurses are not in that category); *see also* R. 267-3 at 35 (Fisher Dep. at 134-35). Palmer suggests that Franz might have had the authority to issue a low bunk permit by citing the testimony of a Wexford representative, who said he had been unable to find an IDOC health services directive specifically stating that nurses could *not* issue medical permits. *See* R. 267-3 at 22 (Fisher Dep. 81). But the absence of an IDOC health services directive prohibiting nurses from issuing medical permits is not evidence to support a finding that nurses have the authority to issue medical permits. All witnesses knowledgeable on the subject testified that nurses do not have such authority, not because of any IDOC policy or practice but by virtue of licensing requirements.[8] Therefore, the Court concludes it is undisputed that Franz did not have the authority to issue a low bunk permit.

---

[8] The Court finds that the testimony of Nicolette Duffield does not create a disputed fact issue on this question. Duffield is an IDOC employee whose job is to supervise the health care unit at Stateville including the administration of Wexford's contract to provide health care services. She was asked several questions about what a screening nurse could do if he sees that an in-coming inmate has a low bunk permit from the transferring institution. In response to those questions, Duffield made general statements about the nurse "act[ing] upon it at that time," or "issu[ing] [the

The undisputed fact that Franz did not have the authority to issue low bunk permits would seem to put an end to Palmer's Eighth Amendment claim against Franz. In *Estate of Miller by Chassie v. Marberry*, 847 F.3d 425 (7th Cir. 2017), the Seventh Circuit made clear that the identity of the defendant sued is crucial in deciding whether an inmate can maintain a deliberate indifference claim based on a high bunk assignment. *Id.* at 426 ("Miller's principal problem is the identity of the two defendants"). In that case, the plaintiff complained to various prison officials about his high bunk assignment, telling them he had a low bunk permit and needed to be placed on the bottom bunk because he had a brain tumor. According to the court, the plaintiff should have sued the officers in charge of the inmate's bunk assignment rather than the correctional officers who the inmate informed about his brain tumor and medical permit. *Id.* at 426-27 (noting that there was no evidence the correctional officers to whom the plaintiff complained played any role in the inmate's bunk assignment). The court rejected the plaintiff's argument that the defendant correctional officers whom he told about his need for a low bunk assignment were responsible for his injuries, calling "[t]hat line of argument [ ] deficient" because, among other things, it "supposes that every federal employee is

---

inmate] a low bunk/low gallery, according to the current order." R. 167-5 at 6 (Duffield Dep. 16-17). But Duffield also listed the medical practitioners who could issue permits, and did not include nurses among them. *Id.* at 4 (Duffield Dep. 8). When asked later to clarify her testimony about what the screening nurse could do in light of the fact that nurses cannot issue permits, Duffield testified that the nurse could take steps to have appropriate medical personnel issue a Stateville permit in place of the Shawnee permit, as opposed to the nurse himself issuing the permit. In particular, the Court reads Duffield's testimony regarding issuance of a "bridge" order as being that the nurse could write the bridge order out for the physician or other authorized medical personnel to sign. *See* R. 167-5 at 13 (Duffield Dep. 44).

responsible, on pain of damages, for not implementing the decision of any other federal employee, so that all [the plaintiff] need show is the existence of a lower-bunk order." *Id.* at 427. An Eighth Amendment violation, the court said, required a showing of deliberate indifference, and "[a] lower-bunk permit does not supplant that framework." *Id.* at 428.

Palmer's arguments against Franz similarly rely on a medical permit to supplant the Eighth Amendment framework. The mere fact that Palmer told Franz about his Shawnee medical permit or that Franz knew about that permit and Palmer's need for a low bunk does not necessarily mean Franz was responsible "on pain of damages" for making sure Palmer was assigned a low bunk. Franz testified, and the Court finds it is undisputed that, the placement of inmates in particular cells and assignment to particular bunks is the responsibility of IDOC security and/or placement officers, not medical personnel. While IDOC personnel will try to honor a low bunk permit issued by medical personnel,[9] Franz could not issue a low bunk permit. The question then becomes whether Franz's failure to take any steps short of issuing a medical permit himself, which he could not do, constitutes deliberate indifference. According to Palmer, there were at least two things Franz could have done to ensure that a low bunk permit got issued to Palmer: call a doctor on the phone during or immediately after the intake screening to get authorization

---

[9] *See* R. 161-5 at 7 (Rabideau Dep. 25) (if an inmate has a low bunk permit, he "should be" assigned to a low bunk at the NRC "contingent on whether the security staff can validate that he actually has one"); *see also Buford v. Obaisi*, 2016 WL 4245513, at *1 (N.D. Ill. Aug. 11, 2016) ("If an inmate has a valid low bunk permit, IDOC provides the inmate a low bunk if there is one available. If there is not an available bunk, the inmate has to wait until one becomes available.").

for a low bunk permit,[10] or place Palmer on the urgent sick call to see a doctor within 24-48 hours. *See* R. 168 at 14-15.[11]

The Court does not believe a reasonable jury could conclude that Franz was deliberately indifferent when he failed to do either of those two things. Both of the options suggested by Palmer assume that the situation of an inmate transferring into the NRC with an already-issued medical permit from his parent institution for a low bunk assignment was so urgent that it justified an immediate after-hours call to a physician. In arguing that a high bunk assignment posed an "imminent" danger to him, Palmer cites to *Withers,* in which the plaintiff alleged that he asked a nurse to let him stay overnight in the prison's Health Care Unit because of back pain he was experiencing. 710 F.3d at 689. He claimed that the nurse "refused and wheeled him back to his cell in a wheelchair; that he told her he wouldn't be able to climb into his bunk (the upper one) and she replied 'when you get tired you'll figure it out,' and left him; [and] that because of his back pain he fell trying to climb into the upper bunk . . . and as a result was injured." *Id.* at 689. The Seventh Circuit held

---

[10] The record indicates that inmates usually arrive at the NRC in the evening when no one with authority to issue permits is present at the institution. If a doctor is needed because of an urgent situation, the nurse would place a call to the medical director. R. 167-5 at 9-10, 14 (Duffield Dep. 27-30, 49).

[11] Palmer also mentions a third option of issuing a "bridge" order to recognize that he already had low bunk permit from Shawnee, the transferring institution. But as the Court already has noted (at footnote 8), Duffield's testimony on which Palmer relies for this option appears to be that the nurse would write up the bridge order for a physician to sign, not that the nurse would issue the "bridge" order himself. To obtain a physician's signature, the nurse would either have to call the physician that night to get phone authorization for his signature, or else refer the inmate to an urgent sick call visit in the next 24-48 hours. Therefore, the "bridge" order option is not a separate and distinct option from the other two.

that "if this narrative is true, it is evidence of deliberate indifference to an imminent danger of injury to a prisoner[.]" *Id.*

*Withers* involve a "classic case of turning a blind eye to 'a substantial risk of serious harm to a prisoner.'" *Estate of Miller by Chassie*, 847 F.3d at 432 (Posner, J., dissenting) (citation omitted). This is not such a case. Palmer was not in a wheelchair and Franz was not "on the scene" and hence aware of any acute situation regarding Palmer's disability and his bunk assignment. *See id.* ("If a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being a doctor; he has to make an effort to find a doctor, or in this case a dentist, or a technician, or a pharmacist—some medical professional.") (internal quotation marks and citation omitted). Franz was performing an intake screening at the time in question; he made note of Palmer's disability; and apparently in response to Palmer's request for a low bunk permit, he marked on Palmer's transfer summary that Palmer needed to see a doctor for a "sick visit." Palmer also knew how to access health care at the institution and could always request a sick visit himself at any time. Typically, an inmate asking for a routine sick call will be seen by a doctor within 72 hours. R. 167-5 at 14 (Duffield Dep. 47-48). Prior to being seen for a sick visit, Palmer could avoid any "imminent" risk of harm by asking his cell mate to switch bunks or by temporarily moving his mattress to the floor. *E.g., Buford*, 2016 WL 4245513, at *3 (inmate who was denied a low bunk assignment and could not climb into top bunk because of Achilles tendon injury was given a mattress to sleep

on the floor).[12] The fact that Palmer submitted two requests to see a doctor in the ten days before the incident occurred, neither of which was honored by IDOC correctional officers, is irrelevant. Franz had no further contact with Palmer after the initial screening and there is no evidence he was aware that Franz would be or was assigned to a high bunk. Nor was it Franz's job to follow-up to see whether Palmer had been assigned to a low bunk. Palmer's need for a medical permit did not present as an "imminent" danger upon his arrival at the NRC merely because of the possibility that some other prison official might not do his job. *See Greeno,* 414 F.3d at 657 (a prison official is not deliberately indifferent because of his "failure to realize the potential gravity of the situation" caused by the deliberate indifference of another official).

In *Whiting*, the Seventh Circuit noted that "[w]hen a prison medical professional is accused of providing *inadequate* treatment (in contrast to *no* treatment), evaluating the subjective state-of-mind element can be difficult." 839 F.3d at 662 (emphasis in original). But "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did, then summary judgment is improper and the claim should be submitted. State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision

---

[12] Palmer was in prisons before where the cell had a top bunk and a bottom bunk yet he did not always have a low bunk permit. He testified that he always had the bottom bunk because frequently, "whoever I was in there with would just be courte[ous] enough to let me have it." R. 161-2 at 15 (Palmer Dep. 56).

departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Id.* at 662-63 (internal quotation marks and citations omitted). Given the record before the Court, no reasonable jury could conclude that Franz's state of mind fell into any of these categories. Indeed, it appears to the Court that how a medical permit from a transferring institution is supposed to be treated by the receiving institution is a subject on which even IDOC and Wexford officials with supervisory responsibilities could not provide a clear or consistent answer.[13]

---

[13] Duffield testified that a transferring inmate with a permit from his parent institution should be given a Stateville permit without need for further medical evaluation, but she did not know what the procedure was for that to happen. *See* R. 167-5 at 13 (Duffield Dep. 44) ("I don't know. I don't want to answer incorrectly."). While she suggested that one possibility was that the nurse could somehow make it happen, she also testified that the inmate had other opportunities as well to obtain a "bridge" permit to apply while he was housed at the NRC. *Id.* at 14 (Duffield Dep. 45-50) ("If that did not happen, they can sign up for sick call to request to go see the physician."). Karen Rabideau, the IDOC placement officer responsible for making cell assignments at Stateville, testified that the Shawnee permit should have been honored by the correctional officers at Stateville without the need for any further steps. According to Rabideau, an inmate who is temporarily transferred to Stateville from another institution "would have to let the [security] staff know [about his current permits at his home institution] . . . because that offender would not have been able to bring his paperwork with him." *Id.* at 6 (Rabideau Dep. 19). If the security staff could confirm that the transferring inmate had a permit, they would order the inmate who already occupied the lower bunk in the cell to which the transferring inmate had been assigned to give it up to the transferring inmate with the permit. *Id.* (Rabideau Dep. 20, 28-29). While this process depended on whether the security staff could confirm the existence of the permit from the transferring institution, Rabideau testified that the computer system in use in 2012 (the Offender Tracking System) would have shown the permit if one had been issued. *Id.* at 8 (Rabideau Dep. 27-28); *see also Buford*, 2016 WL 4245513, at *2 ("The Offender Tracking System, a computing system used by the placement office, shows whether an inmate has a low bunk permit on file."). A supervisory employee of Wexford also suggested that the Shawnee permit might have been honored by IDOC placement or other correctional officers responsible for

If, as the Court finds, the responsible supervisory officials gave inconsistent and/or unclear testimony about the proper procedure to follow in Palmer's situation, then there is no factual basis for saying a nurse who spent less than fifteen minutes with Palmer handled the intake screening in so obviously an inappropriate manner as to warrant in inference that his conduct was "something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). While the Court's analysis at first glance may give the appearance that liability for deliberate indifference can be avoided by having incoherent or confusing policies or practices in place, that would not be an accurate reading of the opinion. Acknowledging that the policies put in place by IDOC and/or Wexford for handling permits from other institutions are confusing at best and incoherent at worst could mean, as the Court finds that it does here, that a particular defendant escapes individual liability for injury caused by deliberate indifference. But the need for clear policy guidelines may itself constitute deliberate

---

Palmer's cell assignment and to whom Palmer complained when he actually received a low bunk assignment. *See* R. 167-3 at 54 (Fisher Dep. 210) (noting it was possible "the pass Palmer had from Shawnee was still in effect"); *id.* at 50 (Fisher Dep. 194) (it could be that the actual policy or practice in effect was to "recognize [permits] from other institutions for a period of weeks before the individual is there knowing that people come in and out [of the NRC] for court"). If, as the IDOC placement officer testified, the Shawnee permit should have been honored by IDOC correctional officers when they placed Palmer in his cell, then, as previously noted, Franz cannot be held liable for the failure of correctional officers to do so. *See Greeno,* 414 F.3d at 657.

indifference of the institution. *See Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372 (7th Cir. 2017).[14]

Ultimately, summary judgment in favor of Franz is appropriate here because there is a complete absence of evidence on which a jury could base a conclusion that Franz's handling of Palmer's intake screening demonstrated deliberate indifference. The most directly applicable principle is that a prison official "whose role was limited" is not deliberately indifferent where there is "[n]othing in the record [to] indicate[ ] that [he] shirked his duty in any way or failed to appropriately handle" the situation. *Greeno,* 414 F.3d at 657; *see also Berry v. Peterman,* 604 F.3d 435, 440 (7th Cir. 2010) (fact that a prison official may not have taken any "further action [beyond what was required of him] cannot be seen as deliberate indifference"). The only evidence to show deliberate indifference cited by Palmer is Duffield's testimony. But she testified she did not know anything about the intake process in the time period relevant to Palmer's Eighth Amendment claim, which was January 2012, *id.* at 7 (Duffield Dep 18), and, in any event, her testimony about what Palmer "could have " done to ensure that Palmer was assigned to a low bunk is insufficient

---

[14] In *Glisson,* the Seventh Circuit said that "[i]t is somewhat unusual to see an Eighth Amendment case relating to medical care in a prison in which" the issue is whether "an organization might be liable [for deliberate indifference] even if its individual agents are not." 849 F.3d at 378. The court stated, however, that such a case was not impossible, explaining that, "[w]ithout the full picture, each person might think that [his] decisions were an appropriate response to a problem; [his] failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.*

to show that Franz "shirked his duties" or that his handling of the situation was inappropriate.[15]

On the other hand, Franz's *supervisor*, Cynthia Garcia, who was Director of Nursing at Stateville, testified that there was nothing further Franz should have done regarding Palmer's need for a low bunk assignment because, as a nurse, Franz could not issue low bunk permits. R. 161-4 at 15 (Garcia Dep. 55-56). According to Garcia, the screening nurse's job is to verify the information provided by the transferring institution on the top portion of the inmate's transfer summary and document on the bottom portion any changes that may have occurred from the time the inmate left the transferring institution to his arrival at Stateville. The nurse would document something he observed or learned about the inmate during the screening "[i]f it's not documented on the top or if it's something that's in a crisis situation." R. 161-4 at 5 (Garcia Dep. 14-15). Garcia noted that Palmer's low bunk permit already was documented by Shawnee medical personnel at the top of his transfer summary. When asked specifically what a nurse should do if during the transfer screening process he perceives that the patient needs a low-bunk permit, Garcia answered: "[ ]he would mark it routine, and . . . tell the offender to fill out

---

[15] Even if Duffield's testimony established that Franz violated some IDOC policy in existence at the time (which it doesn't), the Seventh Circuit has said that a jury cannot "use [a] policy as circumstantial evidence of [the defendant's] knowledge of the risk." *Estate of Simpson*, 863 F.3d at 763, 746-47 (rejecting inmate's reliance on "bottom bunk policy" as evidence from which a jury could conclude that defendants were deliberately indifferent to inmate's need for a low bunk assignment because "Section 1983 protects against 'constitutional violations, not violations of . . . departmental regulation and . . . practices.'") (citations omitted).

sick call slips to be seen by the doctor." R. 161-4 at 19 (Garcia Dep. 70). That is exactly what Franz did here.

None of the high bunk cases Palmer cites supports a contrary finding of deliberate indifference here. *Moses v. Shah*, 2011 WL 5298599 (C.D. Ill. Nov. 2, 2011), only involved a preliminary review of a pro se complaint pursuant to 28 U.S.C. § 1915A. Moreover, the court in that case held only that the plaintiff had an "arguable" Eighth Amendment claim against the doctor who refused on multiple occasions to issue him a low bunk permit, even though he had been given a permit while residing at two previous institutions and had fallen once before while at the current institution narrowly avoiding serious injuries. *Id.* at *1-2. The court dismissed the plaintiff's Eighth Amendment claims against the nurse and the health care unit administrator because they did "not have the authority to override [the doctor's] treatment decisions." *Id.* at *2. Here, there is no evidence that Franz repeatedly refused to issue Palmer a low bunk permit, or that Palmer had previously fallen from a high bunk and Franz knew about the fall.

Palmer also cites two other cases that are distinguishable because they involve Eighth Amendment claims against the placement officers or security guards who had control over bunk assignments and meaningful exposure to the plaintiff's need for a low-bunk assignment over an extended period of time such that a reasonable jury could conclude that the defendants were deliberately indifferent to the inmate's situation. *See Bolling*, 819 F.3d at 1036-37 (reversing a grant of summary judgment for six correctional officers where the officers refused to move

an inmate to a low bunk despite the inmate's fall attempting to reach the top bunk and his subsequent acquisition of a low-bunk permit); *Burford*, 2016 WL 4245513, at *5-7 (denying summary judgment to IDOC security personnel who, over an extended period of time, failed to ensure that the plaintiff was given a low bunk assignment where he suffered from ongoing Achilles tendon pain; ambulated with crutches; informed officers he could not access the top bunk; was consistently provided a low-bunk permit by the medical unit; and fell attempting to access the top bunk within hours of assignment to it). Judge Posner relied on similar facts in his dissent in *Estate of Miller by Chassie* to argue that, "[a]fter [the inmate's] first fall, and certainly after his second, it must have been obvious to [the two correctional officers] and any other prison personnel who knew of [the inmate's] condition that he should not be consigned to an upper bunk." 847 F.3d at 431. Franz is neither a placement officer responsible for bunk assignment nor a physician responsible for issuing permits, and, in any event, there is no evidence that Franz had repeat contact with Palmer or knowledge of any previous falls.

In short, there is no evidence from which a reasonable jury could conclude that Franz was deliberately indifferent with regard to Palmer's need for a low bunk permit while at the NRC. For individual liability to attach, Palmer needed to present evidence sufficient to show that Franz's handling of the intake screening was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Whiting*, 839 F.3d at 664. He did

not do so. Therefore, Franz's motion for summary judgment on Palmer's Eighth Amendment claim will be granted.

### B.   NEGLIGENCE

Palmer also asserts a state law claim for negligence. As the Court sees it, the primary problem with Palmer's negligence claim is that Garcia, Franz's supervisor, testified that Franz's handling of Palmer's intake screening was consistent with institutional and administrative directives on how inmates are to access care. *Id.* at 19-20 (Garcia Dep. 74) (There are institutional directives and administrative directives that we follow on how to access care. The offenders are given a handbook describing how to access care."). Garcia further testified that, while there were "many things the nurse 'could' do" to ensure that an inmate received a medical permit more quickly, "that isn't the standard of care." R. 161-4 at 19-20 (Garcia Dep. at 70, 74). Palmer has presented no evidence that the standard of care for a nurse in Franz's position was any different than that to which Garcia testified.

For this reason, the Court would be inclined to conclude that no reasonable jury could find that Franz's conduct was legally negligent. *See, e.g.*, *Goodson v. Willard Drug Treatment Campus*, 615 F. Supp. 2d 100, 102 (W.D.N.Y. 2009) (noting that the evidence was not sufficient for a factfinder to "reasonably conclude that defendants were negligent in assigning plaintiff to a top bunk"). Yet, in moving for summary judgment, Franz does not make this argument other than in a single sentence in the introduction of his reply brief. *See* R. 172 at 1. The arguments Franz does make include the following: (1) Palmer has failed to comply with the affidavit

requirement of the Healing Arts and Malpractice Act; (2) Palmer cannot establish proximate causation; and (3) Palmer has failed to exhaust his administrative remedies. The Court agrees with Franz on the first issue and therefore need not address the second and third.

"To minimize frivolous malpractice suits, Illinois law requires the plaintiff to file a physician's certificate of merit and accompanying report with every malpractice complaint." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000). Specifically, the Healing Arts and Malpractice Act provides that

> In any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries . . . by reason of medical, hospital, or other healing art malpractice, the plaintiff's attorney . . . shall file an affidavit attached to the original . . . complaint" certifying that the attorney has conferred with a qualified, knowledgeable healthcare professional who, upon reviewing the medical record, concluded that the plaintiff had a reasonable and meritorious cause for filing suit.

735 ILCS 5/2-622(a)(1). The failure to file such a certificate is grounds for dismissal. 735 ILCS 5/2-622(g). If section 2-622 would apply to Palmer's negligence claim in state court, then it also applies in this Court. *Baumann v. Am. Nat'l Red Cross,* 262 F. Supp. 2d 965, 966 (C.D. Ill. 2003); *see Fleming v. Livingston Cnty., Ill.,* 2009 WL 596054, at *3 (C.D. Ill. 2009) ("Although Section 2-622 is a provision located in the Illinois Code of Civil Procedure, many district judges in the Seventh Circuit have treated it as a substantive provision of Illinois law.") (citing cases)). Palmer did not file a section 2-622 affidavit with his complaint. He argues that no affidavit was

necessary because his negligence claim against Franz does not sound in malpractice.

For purposes of section 2-622, "malpractice" is defined, in part, as "[p]rofessional misconduct or unreasonable lack of skill." *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. App. 1995) (internal quotation marks and citation omitted). The term has also been defined as "incorrect or negligent treatment of the patient by a person responsible for his health care," and as "dereliction from a professional duty or a failure to exercise an adequate degree of care in rendering service." *Bommersbach v. Ruiz*, 461 F. Supp. 2d 743, 749 (S.D. Ill. 2006) (internal quotation marks and citations omitted). In *Woodard v. Krans*, 600 N.E.2d 477 (Ill. App. 1992), the Illinois Appellate Court delineated three types of negligence suits against providers of medical services: "(1) malpractice suits requiring expert testimony; (2) malpractice cases not requiring expert testimony; and (3) negligence suits, essentially common-law in character, that happen to be directed against health care providers." *Id.* at 487-88. The court held that only in the last category—common law negligence suits that happen to be against providers of medical services—is a plaintiff required to follow section 2-622. *Id.* at 488. "[T]he possibility that the standard of care may be established by lay knowledge does not necessarily" mean that an affidavit is not required. *Id.* Instead, "the broad realm of medical, hospital or healing art malpractice" includes any case where "the standard of care requires applying distinctively medical knowledge or principles, however basic." *Id.* This means that "the type of case in which a plaintiff need not file a section 2-622

affidavit against a defendant health care provider is the *exceptional* one, defined by the inherent character of the conduct involved rather than whether expert testimony will later be necessary to prove the plaintiff's case." *Id.* (emphasis added).

The conduct on which Palmer relies for his negligence claim is described in the complaint as follows: (1) failing to perform an adequate physical examination of him; (2) failing to assess and determine his medical condition and his medical needs; (3) failing to obtain and examine his relevant administrative and/or medical records; (4) failing to recognize his medical need for a low bunk assignment; (5) failing to document his medical need for a low bunk assignment; (6) failing to notify the correctional staff at the Stateville/NRC facility of his medical need for a low bunk assignment"; (7) failing to ensure that he received an assignment to a low bunk "to ensure his health and safety"; and (8) failing to otherwise ensure his health and safety. R. 65 at 5-6. Regardless of whether expert testimony would be necessary to establish whether Franz's conduct fell below the standard of care on any of these issues, the character of the conduct involved is medical, *i.e.,* the assessment and reporting of the medical needs of a patient. Non-medical personnel do not "assess" and "report" medical conditions. Thus, Palmer's negligence claim raises issues of medical judgment, dereliction from professional duty as a nurse, and/or failure to exercise an adequate degree of care in rendering service as a nurse, and thereby implicates the requirements of section 2-622.

Palmer cites to this Court's opinion in *Hales v. Timberline Knolls, LLC,* 2017 WL 25174 (N.D. Ill. Jan. 3, 2017), to argue that section 2-622 does not apply to his

negligence claim. But *Hales* involved a claim for breach of fiduciary duty, *id.* at *2, while this case involves a claim for negligence. Therefore, the Court finds *Warren ex rel. Warren v. Dart*, 2010 WL 4883923 (N.D. Ill. Nov. 24, 2010), to be more helpful than *Hale*. There the court stated that the plaintiff's claims against the nurse defendants stated a malpractice claim rather than a general negligence claim because the nurses "would be held to a standard of care that applies distinctively medical knowledge or principles." *Id.* at *12. Specifically, the court explained, the nurses' "acts or omissions with respect to McDowell—*i.e.*, their activity concerning whether and/or how to treat [the plaintiff]—necessarily involve medical judgment in light of [the plaintiff's] medical needs and the nurses' professional roles at the jail." *Id.; see also Johnson v. United States,* 2016 WL 3387156, at *11 (N.D. Ill. June 20, 2016) ("insofar as Johnson's claims are predicated on the acts or omissions of Dr. Mohan or nurse Folami, they sound in malpractice and must be accompanied by a certificate of merit"). Palmer's negligence claim similarly concerns Franz's activity of deciding whether and/or how to treat Palmer, which necessarily involves medical judgment in light of Palmer's medical needs and Franz's professional role at the jail. Therefore, like the court in *Warren,* this Court dismisses Palmer's state law claim without prejudice for failure to file the required section 2-622 affidavit. *Id.* (citing *McCastle v. Mitchell B. Sheinkop, M.D., Ltd.*, 520 N.E.2d 293, 296 (Ill. 1988) (ruling that failure to comply with the § 5/2–622 does not require dismissal with prejudice)). Because an negligence claim is a state court action, any refiling with a section 2-622 affidavit must be done in state court.

**CONCLUSION**

For the foregoing reasons, Franz's motion for summary judgment, R. 160, is granted. Judgment in favor of Franz is hereby entered on Palmer's Eighth Amendment claim (Count II), while the Court dismisses Palmer's negligence claim against Franz (Count I) without prejudice.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: September 18, 2017